UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BEYUKA COWART STEWART** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-1139** |
| **COOPERSURGICAL INC.** | **SECTION "L" (5)** |

## ORDER & REASONS

Before the Court are two Motions for Summary Judgment by Defendant CooperSurgical, Inc. R. Docs. 33, 37. Plaintiff Beyuka Cowart Stewart opposes both motions. R. Docs. 49, 58. Defendant filed replies for both motions. R. Docs. 59, 60. On July 24, 2024, the Court heard oral argument on Defendant's first motion for summary judgment. R. Doc. 61. Considering the briefing, applicable law, and oral argument, the Court rules as follows.

## I. BACKGROUND

This action arises from a defective medical product, a Paragard IUD, manufactured and marketed by Defendant CooperSurgical Inc. R. Doc. 1-1. at 5. Plaintiff Beyuka Stewart filed suit on February 4, 2023, for negligence and alleged violations of 21 CFR 201.10, 211.130. *Id.* at 6-7.

On May 15, 2019, Stewart had the IUD inserted without complications. *Id.* at 5. Shortly thereafter, Stewart began feeling pain and cramping which subsided after two days. R. Doc. 33-1 at 2. She has also faced additional pain, cramping, mood swings, and bleeding, since about two months after the IUD placement, which have continued to this day. *Id.* at 3.

On January 12, 2022, Stewart's gynecologist, Dr. Monique Hamilton, confirmed Stewart was pregnant. R. Doc. 1-1. at 5; R. Doc. 33-1 at 3-4. Dr. Hamilton also unsuccessfully attempted to remove the IUD and told Stewart that the IUD was embedded in her cervix and the cause of her "excruciating pain." R. Doc. 33-1 at 4. Two days later, Stewart met with another physician, Dr.

1

Kenneth Byrd, who performed an ultrasound and confirmed that the IUD was embedded. *Id.* at 4.

On January 24, 2022, Stewart met with a third medical specialist, Dr. Stephen Fortunato. During this visit, Stewart complained of immense pain and Dr. Fortunato also attempted to remove the IUD but was unsuccessful. *Id.* On February 4, 2022, Stewart went to the emergency room because of cramping and bleeding where the emergency department provider informed her that she was having a miscarriage. *Id.*

Exactly one year after her miscarriage, on February 4, 2023, Stewart filed this suit against CooperSurgical in the Civil District Court for the Parish of Orleans, alleging that the IUD sold to her was defective and that she failed to receive adequate warnings of the defect before her diagnosis. R. Doc. 1-1. Stewart alleges that "defendants showed a complete indifference to public safety" by failing to issue a warning or recall about the defective product. *Id.* Stewart further alleges that the product was defective when it left the defendant's hands. *Id.* at 6.[1]

Stewart alleges that the incident was caused solely by the gross, flagrant, carelessness, and negligence of the defendant. *Id.* Accordingly, Stewart suffered damages as a result of: (1) emotional distress and mental anguish, (2) grave inconvenience, (3) grave stress, (4) psychological and/or psychiatric damage, (5) past, present and future physical pain and suffering, which will be shown through medical records at a trial on the merits, (6) past present and future mental anguish and emotional trauma, (7) past, present, and future, medical expenses incurred by plaintiff, and (8) past, present, and future loss of enjoyment of life and pursuit of happiness. *Id.* at 7.

CooperSurgical removed this case to this Court based on diversity jurisdiction on April 3, 2023. R. Doc. 4. at 1. In its answer, CooperSurgical largely denies liability and asserts several defenses, including but not limited to: (1) Stewart failed to state a claim upon which relief can be

---

[1] Stewart raises allegations against other parties, who have never been served, and are thus not parties to the suit. *Id.*

2

granted; (2) it complied with applicable codes, standards, regulations, and specifications established, adopted, promulgated, or approved by the United States and State of Louisiana; (3) Stewart is at fault, and such fault was either the sole or at least a proximate cause of her claimed injuries. *See id.* at 2-10. Additionally, it submits a jury demand. *Id.* at 11.

## II. PRESENT MOTIONS

### a. CooperSurgical, Inc.'s Motion for Summary Judgment on Prescription

Presently, CooperSurgical moves the court for summary judgment and argues that Stewart's claims have expired. R. Doc. 33-1. CooperSurgical argues that her claims are governed by the Louisiana Products Liability Act ("LPLA"), which are subject to a one-year long prescriptive period, and that her claims expired, at the latest, on January 24, 2023. Stewart, however, filed her suit on February 4, 2023. La. Civ. Code Ann. art. 3492; R. Doc. 33-1 at 6-7. It argues that Stewart's deposition testimony unequivocally proves that she was aware of the alleged defects of her IUD in January of 2022, thus her claims prescribed in January of 2023. R. Doc. 33-1 at 9 It further contends that doctrine of *contra non valentem* does not help Stewart because her cause of action was "reasonably known" in January 2022. *Id.* at 8, 10. Therefore, CooperSurgical moves this court to enter summary judgment in its favor. *Id.* at 12.

In opposition, Stewart argues that she did not have actual or constructive knowledge of the IUD's defects until after her miscarriage when she started performing her own research. R. Doc. 49. Though she concedes that she knew of the general risks and potential pregnancies that can occur while using an IUD, she argues that only after February 4, 2023, did she learn about other women's experiences with the allegedly faulty IUDs. *Id.* at 4. Accordingly, she argues that the prescriptive period did not begin to run until February 4, 2022. She also argues that because there is a genuine dispute of material fact, CooperSurgical has failed to meet their burden of proof and

3

thus, its motion for summary judgment must be denied. *Id.* at 8-9.

In reply, CooperSurgical reiterates its earlier arguments and further contends that Stewart's opposition rests on a misunderstanding of state law. R. Doc. 59 at 3. It also argues that Stewart's affidavit attached to her opposition does not create a genuine dispute of fact. *Id.* at 5. Thus, it argues summary judgment is proper. *Id.* at 7.

### b. CooperSurgical, Inc.'s Motion for Summary Judgment on Causation

In its next motion, CooperSurgical argues that any LPLA claim requires "proof the product was unreasonably dangerous and a causal connection between the unreasonably dangerous characteristic and the Plaintiff's injuries." R. Doc. 37-1 at 3. Due to the complexity of Stewart's medical causation and defectiveness claims, it argues each claim requires the assistance of expert testimony. *Id.* However, CooperSurgical contends Stewart has failed to serve any expert reports or disclosures by the Court's deadlines. *Id.* at 3-4. Accordingly, it argues that without competent expert testimony, Stewart will not meet her burden of proof, and thus, her claims fail. *Id.* at 5.

In opposition, Stewart argues that she complied with Federal Rule of Civil Procedure 26 requirements when disclosing that her treating physicians will serve as her expert witnesses. R. Doc. 58. Additionally, she notes that these physicians provided medical records which contain information about her condition, treatment, and the connection between the IUD and her miscarriage. *Id.* at 5-6. Under Rule 26(a)(2)(B), Stewart argues that treating physicians are not required to provide a formal expert report when their testimony is based on personal knowledge gained while treating the plaintiff. *Id.* at 4. Accordingly, Stewart argues she met her Rule 26 expert requirements and requests that this Court deny the motion. *Id.*

In reply, CooperSurgical argues that Rule 26(a)(2)(C) requires a party using an expert witness with personal knowledge to disclose the subject matter of the witness' evidence and a

summary of the facts and opinions to which the witness is expected to testify. *Id.* Because Stewart only disclosed general medical records and none of her physicians were deposed, CooperSurgical argues that Stewart has not met the Rule 26(a)(2)(C) requirements. *Id.* at 3. It further argues that Stewart has not tendered any medical record or treating physician's opinion that state her IUD was defective. *Id.* Because Stewart cannot meet her causation burden, CooperSurgical requests this Court grant its motion. *Id.*

## I. APPLICABLE LAW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993).

## II. ANALYSIS

The Court first turns its attention to CooperSurgical's Motion on Prescription.

### a. Whether Stewart's Claims Prescribed Before She Filed Suit

A federal court sitting in diversity must apply state law to issues of prescription. *Calhoun v. Ford*, 625 F.2d 576, 577 (5th Cir. 1980); *see also Mullen v. Sears, Roebuck, & Co.*, 887 F.2d 615 (5th Cir. 1989) (holding that Louisiana code articles regarding prescription apply in a removed

5

diversity case). It is undisputed that Stewart's claims are governed by the Louisiana Products Liability Act. R. Doc. 33-1 at 6; R. Doc. 46 at 6. The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. § 9:2800.52. Delictual actions, such as those found in the LPLA, are subject to a prescriptive period of one year under Article 3492 of the Louisiana Civil Code. "[The prescription of delictual actions] commences to run from the day injury or damage is sustained."   La. Civ. Code Ann. art. 3492 (2016). Accordingly, a one-year prescriptive period applies to all of Stewart's claims.

CooperSurgical argues that Stewart's claims were prescribed when she filed suit against it on February 4, 2023. It argues that, at the latest, prescription began to run on Stewart's claims on January 24, 2022. In opposition, Stewart argues that the doctrine of *contra non valentem* applies here such that prescription did not begin to run until February 4, 2022. Thus, if the Court agrees that *contra non valentem* applies and the prescriptive period did not begin to run until Stewart's miscarriage, her claims are not prescribed.

Under the doctrine of *contra non valentem,* prescription does not run against a claimant who is ignorant of the existence of facts that would entitle him to a cause of action, provided that his ignorance is not willful, negligent or unreasonable. *See, e.g.*, *White v. W. Carroll Hosp., Inc.,* 613 So. 2d 150, 155–56 (La. 1992); *Corsey v. State ex rel. Dept. of Corr.,* 375 So. 2d 1319, 1321 (La. 1979). Under *contra non valentem*, four exceptions to liberative prescription exist. However, only the fourth exception is at issue in this matter: where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant.[2] *Daigle v. McCarthy*, 238 F. App'x. 1, 3 (5th Cir. 2007)

---

[2] The other three exceptions are: (1) where there was a legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition or matter coupled with the proceedings which prevented a creditor from suing or acting; (3) where the defendant has done some act to prevent the plaintiff from availing himself of his cause of action. *Id.*

This exception, known as the discovery rule, is available only in "exceptional circumstances." *Ellis v. Evonik Corp.*, 604 F. Supp. 3d 356, 364 (E.D. La. 2022) (citing *Meggs v. Davis Mortuary Serv., Inc.*, No. 19-432 (La. App. 5 Cir. 8/5/20); 301 So. 3d 1208, 1213). It provides that a plaintiff must have actual or constructive notice of the tortious act, the damage, and the causal link between the act and the damage for prescription to commence. *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992); *Ellis*, 604 F. Supp. 3d at 367. "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Ellis*, 604 F. Supp. 3d at 364 (internal quotation and citation omitted). "[Constructive] notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and therefore "is sufficient to start running of prescription." *Id. (*citing *Meggs*, 301 So. 3d at 1213 ("If the plaintiff could have discovered the cause of action by exercising reasonable diligence, the doctrine will not prevent the running of prescription.")). It is not necessary that the plaintiff actually know of the injury or the cause of the injury for prescription to commence; rather, "the plaintiff will be deemed to know that which he could have learned by reasonable diligence." *Miles v. MEMC Pasadena, Inc.*, No. 08-4436, 2009 WL 1323014, at *3 (E.D. La. May 8, 2009). The question before the Court is thus whether the circumstances of the Stewart's miscarriage on February 4, 2022, or on some other date prior, put Stewart "on guard and call[ed] for inquiry," such that she had constructive or actual knowledge of her causes of action against CooperSurgical. *Ellis*, 604 F. Supp. 3d at 364.

The Court finds that Stewart had constructive notice by January 24, 2022 of her potential claims against CooperSurgical. As another court in this circuit has previously held, "it is the plaintiff/patient's knowledge of the connection between their alleged injuries and damages and the medical product that is key to the accrual of the cause of action." *Peterson v. C.R. Bard, Inc.*, 2015

7

WL 2239681, at *2 (M.D. La. May 12, 2015). It is clear from Stewart's testimony that by January 24, 2022, she was aware of the connection between her pain and the IUD.[3] She was also aware that the IUD had not performed as intended as several doctors advised her that the IUD had migrated to her cervix and that she was pregnant.

Stewart's argument that *contra non valentem* tolls prescription until the date of her miscarriage is without merit as she misstates the standard used to start the running of prescription. As explained, she need not actually know of the defective nature of the IUD. Rather, if she had constructive knowledge and "could have discovered the cause of action by exercising reasonable diligence," then prescription will begin. *Meggs*, 301 So. 3d at 1213. The Court reaches this conclusion after considering her deposition testimony where she explains that by mid-January she had met with three different physicians and they all informed her that her pain was being caused by the IUD.[4] The Court briefly discusses each visit.

Regarding Stewart's visit with her gynecologist, Dr. Hamilton, on January 12, 2022, she testified that Dr. Hamilton first confirmed Stewart's pregnancy:

> Q[COUNSEL]: Okay, again, take me back to this moment, if you

---

[3] The Court notes that it is possible that prescription of Stewart's claims started to run at a date earlier than January 24, 2022. However, CooperSurgical offers the date of January 24, 2022, as the date prescription began to run and thus, the Court will use this date for its discussion.

[4] Stewart also argues that prescription on her claims only began to run on the date of her miscarriage because she did not research the Paragard IUD's alleged defects until after this date. However, that argument can be disposed of as well. While her deposition testimony indicates that much of her research was done after her miscarriage, she did in fact conduct research in January of 2022:

> Q: And I'm trying to go back in time to when you first learned that you were pregnant, January 2022, and the excruciating pain. Were you feeling anxiety symptoms then?
> A: I was feeling anxiety symptoms, because at this point that's where - - when I became pregnant, that's why I started doing more research. And so I was hearing horror stories about these women who had ectopic pregnancies. And what I am feeling, combined with what I'm reading, it was going on, so I'm nervous, I'm anxious, I'm scared, . . .

R. Doc. 33-5. at 88:6-15. Her statements here alone demonstrate that her pain "call[ed] for [her] inquiry" as she researched the symptoms she was facing. *Ellis*, 2022 WL 1719196, at *4. Accordingly, the Court finds that *contra non valentem* did not delay the running of prescription to the date of Stewart's miscarriage.

> will. You've just taken a pregnancy test, you then go in and meet with Dr. Hamilton on January 12, 2022, and she confirms that you are pregnant.
> A[STEWART]: Yes.

R. Doc. 33-5 at 80:3-7. Next, they formulated a plan while Dr. Hamilton attempted IUD removal:

> Q: What else do you recall about that visit with Dr. Hamilton on January 12, 2022?
> A: At that time she asked me what course of action did I want to take; did I want to keep the baby or did I want to terminate the pregnancy. And when I told her I intended to keep my baby, we moved towards I guess an OB course of action. And that's where she - - Oh, that's when she tried to remove the IUD.

*Id.* at 80:8-15. Stewart further testified that Dr. Hamilton wanted to remove the IUD because it migrated to a different part of Stewart's body:

> Q: . . . .[W]hat was your understanding of why she wanted to remove the Paraguard [IUD]?
> A: Just because I had become pregnant and, clearly, it wasn't in a place where it needed to be, so she wanted to get it out.
> Q: And she communicated that to you?
> A: Correct. Yes.
> Q: That it was in the wrong place and needed to come out?
> A: Correct.

*Id.* at 80:17-81:1. Next, Stewart testified that the attempted removal caused her "excruciating pain" and Dr. Hamilton explained that the pain was due to the IUD's movement to Stewart's cervix:

> Q: In your discovery responses that you wrote down, it said that her attempt caused excruciating pain.
> A: Excruciating pain. It was like someone was pulling my vagina out.
> . . .
> Q: Did Dr. Hamilton give any explanation as to what was causing your pain?
> A: Yes. That the Paragard had migrated to my cervix, and embedded itself in my cervix. And the pain I was feeling from the arm [of the IUD] being embedded in my cervix, which was causing it not to release.

*Id.* at 81:13-82:3. The above testimony alone indisputably demonstrates that Stewart understood

that the "excruciating pain" she endured was due to the IUD migrating to and embedding in her cervix on January 12, 2022. However, Stewart also testified about her experiences with other doctors and pain she endured in between appointments. The Court discusses those as well.

Two days after her appointment with Dr. Hamilton, Stewart had an appointment with Dr. Byrd, who confirmed via ultrasound that the IUD was embedded in her cervix:

> Q: . . . [B]ased on your recollection, you just recall Dr. Byrd doing the ultrasound January 14, 2022, and confirming what you had already learned from Dr. Hamilton, that the Paragard was embedded?
> A: Yes.

*Id.* at 85:17-21. Before her appointment with the third doctor, Stewart testified that she continued to have pain in her abdomen, which felt different than her pregnancy symptoms:

> Q: Can you describe, if you recall, what you were experiencing . . . And let's start with were you experiencing any pain, ongoing pain? You indicated that when [Dr. Hamilton] tried to remove the Paragard you had excruciating pain. Did that excruciating pain last?
> A: Yes.
> Q: Was it the same intensity? Did it change at all between the time - -
> A: It wasn't the same intensity, but it still was a throbbing pain in my abdomen. And of course still I had the pregnancy symptoms . . .
> Q: Did the throbbing pain feel different to you than just pregnancy symptoms?
> A: Umm, umm, yes. Because with my prior pregnancies I never had like any pain in my abdomen unless I was . . . ready to deliver . . .
> Q: So it seemed separate from your pregnancy?
> A: Correct.

*Id.* at 86:13-87:7. And finally, Stewart testified that on January 24, 2022, she met with Dr. Fortunato who also attempted IUD removal, which caused Stewart more pain:

> Q: When you met with the specialist in January of 2022, you mentioned. . . that you recall Dr. Fortunato tried, also, to remove the Paragard.
> A: Yes.
> . . .
> Q: . . .[Y]ou described his attempt caused excruciating pain again?

10

> . . .
> A: . . . His was more forceful than Dr. Hamilton's, which was more painful. As I'm screaming, I'm telling him, and I'm explaining to him what I'm experiencing. He was like, "Oh, okay. Well, just let me see." But I'm like - - I remember I stopped him. I'm like, "No I don't want - - I don't want to try anymore." . . .

*Id.* at 90:17-91:10. Stewart further testified that Dr. Fortunato explained that the IUD's placement could lead to a miscarriage and he too confirmed that it was embedded in her cervix:

> A: [H]e was the one who told me that, you know, having it embedded in my cervix can cause a miscarriage, and things of that sort, because it wouldn't come out and I did not - - I did not want to try again at all. Like I was visibly shaking, because I was in so much pain. I'm like no, I don't want to do this anymore . . .
> Q: And you mentioned in your Interrogatory Responses that he's confirmed what Dr. Hamilton said, that the Paragard was embedded?
> A: Correct. I think he went into a little more detail about the placement of the Paragard . . .
> Q: Not where it should be?
> A: Not where it should be, correct. And not easily removable.

*Id.* at 91:12-92:9.

After reviewing Stewart's deposition testimony summarizing her experience with all three doctors, it is clear that by January 24, 2022, Stewart had more than simply "whatever notice is enough to excite attention" that her "excruciating pain" was related to her Paragard IUD. *Ellis*, 604 F. Supp. 3d at 364. By then, she had visited with three separate doctors and confirmed that (1) she was pregnant, (2) the IUD was embedded in her cervix, and (3) attempted IUD removals caused her pain. Thus, the Court finds that, at the latest, Stewart had constructive notice of her claims against CooperSurgical on January 24, 2022, which triggered prescription to commence.

The Court's holding is further bolstered by other IUD cases brought under Louisiana law. In *Averette v. Bayer Healthcare Pharmacy, Incorporation*, another section of this Court granted a manufacturer's 12(b)(6) motion because the plaintiff's LPLA claims stemming from her IUD had

11

prescribed. No. 13-5968, 2014 WL 1246851, at *3 (E.D. La. Mar. 25, 2014). There, plaintiff felt severe pain shortly after IUD insertion. Four years later, on May 10, 2011, plaintiff's physician unsuccessfully attempted to remove the IUD. On July 1, 2011, the physician surgically removed the IUD. Plaintiff filed suit on September 9, 2013 against the IUD's manufacturer. In its motion, the manufacturer argued that plaintiff's claims had prescribed a year after she began experiencing severe pain and thus, plaintiff's claims were untimely. In granting the motion, the Court stressed that "it would be unreasonable to argue that notice was sufficiently present for [plaintiff] to seek medical attention, request that the device be removed, and ultimately have the device surgically removed, but not sufficiently present to prompt further inquiry into the presence of a possibly tortious act within the one-year prescriptive period." *Id.*

Likewise, it would presently be unreasonable for this Court to find that notice was "sufficiently present" for Stewart to seek medical attention from several doctors, receive confirmation that she was pregnant and that the IUD had migrated into her cervix as well as the cause of her pain, and undergo two attempts to remove the IUD in January of 2022, but not sufficient to prompt Stewart's inquiry into possible LPLA claims against CooperSurgical during that same timeframe. *Id.*; *See also In re Mirena IUD Prods. Liab. Litig.*, No. 13-3383, 2015 WL 144214, at *3 (S.D.N.Y. Jan, 9, 2015), *aff'd sub. nom, Bayer Healthcare Pharm. Inc.*, 667 F. App'x 321 (2d Cir. 2016)("Each of the Louisiana Plaintiffs alleges . . .that she underwent an operation to remove the [IUD] from an area of the body where it was not supposed to be . . . such an occurrence gives a plaintiff a reasonable basis to believe that she may have a claim against the device's manufacturer and thus is sufficient to trigger the Louisiana statute of limitations.").

To summarize, this Court presently finds that the one-year prescription period on Stewart's claims commenced on January 24, 2022. By that date, she (1) experienced excruciating pain related

to her IUD, (2) attended multiple doctors' appointments, (3) twice attempted removal of the device, and (4) confirmed that the IUD had migrated and embedded into her cervix. However, she did not file her suit until February 4, 2023. Because her lawsuit commenced after the prescription period expired on January 24, 2023, all her claims against CooperSurgical fail.

    b. **Whether Stewart Meets Her Burden of Causation**

Since the Court finds that Stewart's claims are prescribed, the Court finds it unnecessary to further discuss CooperSurgical's second motion for summary judgment.

### III. CONCLUSION

**IT IS HEREBY ORDERED** that CooperSurgical, Inc.'s Motion for Summary Judgment, R. Doc. 33, is **GRANTED**. **IT IS FURTHER ORDERED** that Cooper Surgical, Inc.'s Motion for Summary Judgment, R. Doc. 37, is **DENIED** as **MOOT**. **IT IS FURTHER ORDERED** that this matter be **DISMISSED** with prejudice.

New Orleans, Louisiana, this 25th day of July, 2024.

                                                                      United States District Judge